We'll turn to our next case, which is United States of America v. George S.Q. I don't have a docket sheet here. I don't have a calendar. Thanks. Continue. Michael Sternheim on behalf of Appellant Virgil Flavio Georgescu. Mr. Georgescu is entitled to a new trial because of the erroneous and prejudicial jury instruction on his entrapment by estoppel defense. To make out this defense in the Second Circuit, a defendant does not need to show that he was actually authorized by a government official. He only needs to show that the government official's statements or conduct seemingly authorized him to act. However, the district court here did not follow this well-recognized rule when it instructed the jury. Why were you entitled to an instruction at all in this case? There was a conversation with the operator in which he said he wanted to report information. And the operator listened and said, fine, I'll talk to other people. We'll get back to you, in essence. This was well before most of the conduct took place here. This was after the initial meetings with Andy and Georgescu and so forth. And then after that, there was no further contact at all. No requests by the government, nothing. And so under those circumstances, why was there even sufficient evidence to request a charge? Two points, Your Honor. First, I think in terms of the role of the CIA official on the phone line, the CIA person whom Mr. Georgescu spoke to identified the first caller as an investigator, as opposed to, say, a simple telephone officer, like someone you'd call from Verizon customer service. And then that's the point of the actual content of the conversation. Mr. Georgescu first did give the CIA official information on what he believed to be a plot to obtain weapons by people he believed to be in the FARC. The CIA telephone operator expressed great interest in this information, but explained that he needed confirmation. He needed to vet. He needed more to confirm Mr. Georgescu's account. He wanted to be. Maybe he wanted to be an informant at that point. But then Mr. Georgescu outlined a plan to provide that confirmation. And he said, okay, this is coming from Georgescu. But then the CIA official on the phone line says, okay, I understand, no less than nine times in the context of that conversation. What else was he going to say? The guy's talking? Yes, okay, I understand. However, however, we'll get back to you. I have to talk to people about it. How is he recruited under those circumstances? Looking at the totality of the conversation. I don't even begin to think that he was recruited under those circumstances. And then there's no reporting when he's engaged in all the meetings. He's not meeting with the CIA. He's not meeting with anybody at that point. He just goes through with all the meetings and the transactions, and ultimately, you know, the deal is advanced. Well, Your Honor. Over years. In a case like, for instance, ab casis, where, again, there is no express authorization, but there is a conversation that could be reasonably understood, a request for information. My question is reasonably understood and being able to mount a defense on that basis, given the response that was given. Well, again, there was sufficient evidence to get to the jury instruction because of this conversation, because of his prior experience as a cooperator, because of his testimony regarding his own internal belief, and our argument. But as far as the actual statements are concerned, I just don't see it. I mean, I'm looking at the transcript here, and, you know, you have various statements here. But, you know, what he planned to do, you know, the operator responded, okay, I understand, as he was talking about information that he wanted to give. Okay, I understand. And then he offered to assist the CIA if they wanted it. And the operator said, if we need to reach back out to you, we can do that. And that was the end of the conversation. There was no further conversation. This was in 2012. And, you know, and thereafter, there was activity for a considerable period of time with no conversations with the CIA. I understand, Your Honor. I think this is, at base, this really is an issue of fact for the jury to decide under the appropriate legal standard, whether he did make out the case that he reasonably relied on. In any event, that was my initial concern, and I'll let it pass whether it remains. And you can make the rest of your argument, because you were arguing about the charge itself. Yes, well, again — There was a charge given. There was a charge given. I feel that it was kind of generous for the judge to give a charge. Be that as it may, Mr. Dreschke was still entitled to an accurate jury charge. And here, the district court, in relying on United States v. Miles for its entrapment charge, relied on language that was, in effect, dicta. Miles does not address the jury standard at issue. It deals with a very narrow issue entirely unrelated to this case, and that's whether a defendant must be induced to engage in the illegal — or must be induced by a federal official as opposed to a state or local official. More importantly, Miles does not reflect Second Circuit law on entrapment by estoppel. Rather, the government cherry-picked the one case from this Court's entire jurisprudence on entrapment by estoppel with the word affirmative in it. But no other case from the Circuit has imposed or even recognized the added element of affirmative conduct or statements. Not Appe Casis, Gill, George, Giffen, or Williams include this language in the standard, and neither does Mergen, which postdates Miles and is this Court's most recent entrapment by estoppel decision. Mergen required seeming authorization without the added element inserted by the district court. And as the Mergen Court recognized, entrapment by estoppel only requires implicit authorization. District courts from the Circuit, Thomas and Tanawanakote, are also in accord. Put simply, affirmative conduct or statements is not part of Second Circuit law on entrapment by estoppel. And the district court erred by including this language in its instruction, and that error did prejudice Mr. Georgescu. In fact, it was highly prejudicial because the primary focus of entrapment by estoppel is the government official's conduct, and a defendant must show that the government official's conduct or statements seemingly authorized him to act. The added element of affirmative conduct or statements in the jury instruction here imposed a much higher burden on Mr. Georgescu. To a juror, affirmative conduct or statements could mean explicit authorization. In other words, based on the instruction here, a juror could have been misled into believing that Mr. Georgescu could make out his defense, only if he proved that the CIA official said, yes, you can do this, or use other similar affirmative language. But that's the required showing for actual authority, which requires a defendant to prove that he was, in fact, authorized to act. In cases like Pabitz and Grahalis, appellate courts reverse convictions where, like here, the jury instruction imposed an elevated burden. This is a case where a single word like affirmative does matter, because Mr. Georgescu's entire defense was based on his honest and reasonable belief that he was authorized to act based on his conversations with the CIA officials. A trial defense counsel on a number of occasions told the court he would object to an instruction as long as the word affirmative was in there, because he knew it would limit Mr. Georgescu's defense to explicit authorization. By inserting the... So is it your view that government silence could be argued to the jury as a basis for a mistaken belief by the defendant that he was authorized to purchase arms? No, Your Honor. We're not arguing for silence as acquiescent standard. We're arguing that entrapment by estoppel does not require explicit authorization. In fact, entrapment by estoppel was recognized because of the unfairness of prosecuting somebody where the government, by its own conduct, induced that person to act. And had the district court properly instructed the jury, a juror plainly could have found that Mr. Georgescu honestly and reasonably believed that he was authorized to investigate the weapons deal on the basis of the CIA official's seeming authorization. Accordingly, Mr. Georgescu should be entitled to a new trial. Thank you. You have reserved some time for rebuttal. Two minutes. We'll hear from the government. May it please the court, my name is Elon Graf. I'm an assistant U.S. attorney in the Southern District of New York. I represent the government in this appeal, and I represented the government at trial. I'm going to try and focus the bulk of my time arguing before the court on why the instruction that was given was wholly appropriate and consistent with Second Circuit law. But I do want to begin speaking to what Judge Walker had identified as his initial reaction. I think if you look at the defendant's testimony in this case, and in particular the portions described on pages 20 and 21 of the government's brief, you see the strained interpretation that the defendant, in presenting his version of how this could be read as authorization, how far he had to strain words like okay or we'll look into it in order to come up with any plausible and ultimately, as the jury determined, implausible and unreasonable determination that he was in fact authorized to engage in the clandestine international gun trafficking operation that he represented to the jury. That was his true undertaking. Notably, defense counsel has not and cannot on this appeal identified any case involving similar facts, a call to a tip line or a crime stopper's line or any interaction of this nature that appropriately gave rise to the defense. And to the extent that counsel both in their brief and in their argument moments ago highlighted Georgescu's prior experience as a government informant as a fact militating in his favor and underscoring the reasonableness of his interpretation, in fact the opposite is true. As reflected in the addendum to the government's brief on pages 4 to 9, this defendant in making his assessment had the benefit of an understanding of how an informant operation worked. He had previously been tasked. He understood that he could commit no crimes without explicit authorization because he had signed a document to that effect. But just to spend a few moments on even if he could make out the defense, even if some instruction was warranted, I think it is misleading to suggest that the government cherry picked the suggestion that some clear direction is appropriate from Miles. Just at the outset, it is clearly stated in Miles that is a Second Circuit decision in this circuit. It is law in this circuit and there is no intervening law in the Supreme Court or the Second Circuit that has undercut it. Separate and apart from that, even if Miles did not exist, Giffen, as counsel noted in footnote 13, cited approvingly to the First Circuit and the Third Circuit decisions in Pardue and West Indies Transport. The First Circuit decision using the word affirmative with reference to an affirmative representation and the Third Circuit decision indicating that the doctrine was appropriate where a government agent told the defendant that certain criminal conduct was legal. Abcasus talked about at 45 F. 3rd 43 indicated that an agent had to have, quote, effectively communicated an assurance, a word that in this context seems synonymous with affirmatively. It also cited approvingly to the Tenth Circuit's decision in Nichols on the same page, which uses the language where a government agent affirmatively misleads a defendant. Again, that was in articulating the doctrine in the circuit. Similarly, Corso, which predated Abcasus, indicated when quoting the Ninth Circuit that the doctrine was appropriate when an authorized government official tells a defendant that certain conduct is legal and the defendant believes the official. That is the doctrine in this circuit that is embodied in Sands' instruction, and that's how the jury was properly instructed in this case. The defendant's conduct here illustrates why this prudential limitation on the law is appropriate, precisely because the law does not contemplate a scenario where any tipster is immediately transformed into an independent operator, an undercover agent. But what's required from the government is statements or conduct? Your Honor, I don't think that's what's required from the government. One could imagine, and the cases in which the doctrine has been allowed, have been circumstances where either the defendant has like Abcasus, where it's the defendant's contention that DEA agents with whom it was uncontested he had previously been an informant had indicated to him that his participation in a drug transaction was authorized. So the absence of no is not yes? The absence of no is not yes, precisely, Judge Blatt. And there was no response, actually, after the second call? In this case, not only was there no response, but as the government notes on page 42 of its brief footnote 4, Georgescu expressly indicated in the appendix at 160 that he wouldn't take action until he was directed to do something. You just give me a call or someone and tell me go forward, and I go forward. So there was no contact between the CIA or any other government agency with Georgescu, and to the Court's point, there was no effort by Georgescu to renew conduct either in the two years between when he placed the call to the tip line or at any point in the multi-month clandestine operation in which he engaged. But what about his past history? Your Honor, as I was suggesting earlier, I do think that his past history is relevant. It was one of the factors that the government noted in seeking a below-guideline sentence in this case. But while it might be relevant to his individual characteristics, with respect to the entrapment by estoppel instruction, which asks what an objectively reasonable person sincerely desirous of obeying the law might do, that experience cuts wholly against the defendant, cuts wholly against Georgescu here. As I mentioned earlier, he had signed admonishments. He had been tasked. He had participated in investigations. He knew what that looked like, and he knew that it did not look like a passive call to a tip line. It looked like, as he testified, it looked like regular interactions with a government agent in which the government agent told him that he should do certain things at the government's direction. He had once signed a document and a second time received the same admonishments from an FBI agent many years before the conduct at issue here, many years before the tip line call, in which he affirmed that he knew that he could not commit crimes just because he was working with the government. Sotomayor. Oh, he did the deal, and he reaped the profit of the deal? Your Honor, in this case, because he was arrested before the deal was completed, he didn't reap the profit, but as the government argued to the jury and as the evidence at trial clearly showed, he was certainly contemplating profit in this case. He, in fact, inflated the contract in concert with the cooperating witnesses, which served no evidentiary purpose if one bought his suggestion that he was doing this to gather evidence for the U.S. government, but certainly served to line his pocket and to increase his prospective profits. Unless there are other questions from the Court, I'll rest on our brief. Thank you, Counsel. Thank you. Mr. Sternheim, you've reserved two minutes for rebuttal. Yes, Your Honor. Just a couple points on the Miles language that cites back to Giffen and then regarding Perdue. The Court there was rejecting an argument that we're not making. We're not arguing, as I mentioned earlier, we're not arguing that silence is authorization, and that was really the issue that they were talking about in that footnote in Giffen, so it's not necessarily applicable to the facts here. We're arguing instead that the statements in conduct by the CIA official, the okays, the I understands, the request for confirmation would have been sufficient to create a reasonable belief that he was seemingly authorized to act. What about the point that your client wanted some sort of confirmation and said to the effect, just let me know and I'll go ahead? Your Honor, he certainly said that, but the argument that we're making is that looking at the totality of the conversation. We're looking at what his subjective belief could have been, and how is that because he had walked this telephone operator, this inspector through, investigator, sorry, through his plan. But then he says, if you want me to go ahead, let me know. How is that statement consistent with the fact that he had a belief that you didn't really have to let me know. I have authorization now. I mean, it's superfluous. It's unnecessary if that's the case, but he said it. Ultimately, Your Honor, this is an issue for the jury and a jury to have considered with a proper instruction. Mr. Gorgeski was entitled to have that decision made by a properly instructed jury. This court has repeatedly reversed convictions based on defective instructions in order to ensure the fair . . . I don't have any case on these facts that's of this skimpy, very skimpy nature of the contacts with the government. It's just . . . Well before the activity is undertaken, he goes forward. There's no communication. Nobody from the CIA calls him. He doesn't call the CIA afterwards. And he engineers, over a period of years, a very elaborate arms deal without any communication to anybody. How would the CIA have possibly benefited from this? Well, Your Honor, his stated intention, as he said several times during the call, was I'll let me go deeper. I'll get that information for you so that you can know about what he believed to be FARC members trying to obtain weapons. And so, again . . . As the transactions unfolded, nothing at all about any effort by him to contact them and to let them know more. And, you know, if he had been authorized to do something for them, he wasn't doing a very good job of fulfilling that authorization. Again, Your Honor, I understand, and those are the facts in the record, but Mr. Georgescu was still entitled to a proper jury instruction, and as I meant, the fair administration of justice requires that. And this Court is . . . Well, that's one question, whether he was entitled to any instruction. And then the second one is whether there was a problem here in light of Miles. Go ahead. This rebuttal. Go ahead. You know, rebut. Again, Your Honor, I think whether or not he proved his defense is ultimately an issue for the jury. And we'd say, again, just looking quickly to rebut one point, the idea that there has not been an intervening decision after Miles is incorrect because Mergen, which discussed the issue of entrapment by estoppel, did not use the affirmative language in the instruction, used the language seeming authorization. And again, by raising this bar, by elevating the standard to something looking like an actual authority defense, the district court effectively precluded the jury from finding that Mr. Georgescu could make out his defense, even based on the evidence that he presented. Thank you. Thank you. Thank you both. We'll reserve decision.